Leathem D. Smith, Appellee, v. Material Service Corporation et al., Appellants.

Gen. No. 41,728.

434

Heard in the third division of this court for the first district at the June term, 1941. Opinion filed January 7, 1942. Rehearing denied January 28, 1942.

D'ANCONA, PFLAUM & KOHLSAAT and WERNER W. SCHROEDER, all of Chicago, for appellants; D. H. MANN, of Chicago, of counsel.

HARRY A. BIOSSAT, of Chicago, for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

The Material Service Corporation, one of the defendants, (hereinafter called the corporation) is now and for many years has been dealing in sand, gravel and other building materials, with its principal office located in Chicago. Defendants, Henry Crown and Irving Crown, have been and are now officers of that corporation. Plaintiff, Leathem D. Smith, is and has been engaged since 1910 in shipbuilding and in boat operations on the Great Lakes. He resides and has his shipyards in Sturgeon Bay, Wisconsin, and maintains an office in Chicago. At the time of the various transactions hereinafter discussed, plaintiff was president of the Leathem Smith-Putnam Navigation Company, a corporation (hereinafter called the navigation company). The sole asset of the navigation company consisted of a motorship known as "Material Serv-

ice." Since 1929 this ship was used for the purpose of transporting gravel for the company. Plaintiff was also president of the Leathem D. Smith Steamship Company (hereinafter called the steamship company). The sole asset of the steamship company was a ship known as the "Sinaloa," which was used to obtain sand and to transport the same for the corporation. The navigation company carried insurance on the motorship "Material Service" in the aggregate amount of $280,000. The insurance consisted of a number of policies, among which was an earnings insurance policy in the amount of $50,000. The policies on the hull of the vessel were underwritten by American companies and the $50,000 earnings insurance policy was underwritten by British companies. The earnings insurance policy protects the ship owner against loss of anticipated earnings in connection with the operation of the vessel during a certain period of time. The motorship "Material Service" sank in Lake Michigan on July 29, 1936. A few days thereafter, on August 7, 1936, an agreement was entered into between the corporation and the navigation company. At this time the parties struck a balance, whereby it was agreed that the navigation company owed the corporation $3,204.67. The corporation also agreed to loan an additional sum of $14,795.33, and thus the navigation company became indebted to the corporation in the sum of $18,000.00. The agreement recited that the navigation company, as partial consideration for the making of the loan,

"Has contemporaneously with this agreement, executed its collateral promissory note in the sum of $18,000.00, due ninety (90) days after date hereof, and ninety (90) days after the date borne by said note, with interest at six (6) percent per annum from and after the date of said note, said note being payable to first party [the corporation]; it is agreed that said note may be renewed for ninety (90) day periods from

time to time, but in no event shall the final renewal maturity date be later than October 1, 1938.

"Second party [the navigation company] agrees to and hereby does secure the said collateral note with the following collateral as security for the payment thereof, and herein represents that it is the sole owner of such collateral:

" 'Seven (7) $1,000.00 First Mortgage 6½% Sinking Fund Gold Bonds, dated June 1, 1928, of the Leathem Smith-Putnam Navigation Company, secured by first preferred mortgage on motorship "Material Service," serially numbered as follows: M-2, M-15, M-84, M-103, M-104, M-112, M-123; each of said bonds being in the principal face value of $1,000.00, together with all unmatured interest coupons attached thereto; four (4) bonds of the same issue in the principal face value of $500.00 each, the serial numbers of which are: D-25, D-29, D-31, D-42, together with all unmatured coupons attached thereto; nine (9) bonds of the face value of $1,000.00, each serially numbered as follows: M-17 to M-25, both inclusive, more particularly described as: 6½% Sinking Fund Gold Notes of the Leathem Smith-Putnam Navigation Company, dated April 1, 1930, secured by junior preferred mortgage on the motorship "Material Service." ' '

"And to further secure payment of the note agrees to and by these presents does assign to First Party the certain policy of insurance covering the said vessel 'Material Service,' which said policy is in the aggregate principal sum of $50,000.00, known as an 'earnings policy,' and written by Lloyds in the sum of $37,140.00; by Sun Insurance Office, Ltd., in the sum of $8,165.00; by the Planet Assurance Co., Ltd., in the sum of $4,080.00; and by British Traders Insurance Company, Ltd., in the sum of $615.00; and forthwith hereafter, upon the execution hereof, to do or cause to be done all things necessary including the execution of any instruments for the purpose of perfecting such

assignment of policies of earnings insurance." This agreement also contemplated that should the motorship be raised and repaired within a certain period, it would be used for the affreightment of cargoes by the corporation. Contemporaneously with the execution of the agreement of August 7, 1936, the navigation company, by plaintiff, its president, executed its promissory note in the sum of $18,000, payable to the order of the corporation 90 days after date with interest at the rate of 6 per cent per annum. The note recited that the maker "hereby transfers, pledges and delivers to the payee the following property as collateral security for the payment of this note and of all other liabilities of the undersigned to the payee, whether direct or contingent, due or to become due, or now or hereafter contracted or existing." Here appears a list of the securities pledged, including the $50,000 earnings policy of insurance. On the note, immediately above the signature of the maker, also appears the following:

"And the undersigned hereby gives the payee, or the holder hereof, authority to sell, assign and deliver said property, or any part thereof, or any substitutes therefor, and all additions thereto, on the maturity of this note, or any time thereafter, or before maturity, in the event the said property depreciates in value, at public or private sale, without advertising the same, or demanding payment or giving notice to the undersigned, and at such sale or sales the payee or any holder hereof may become the purchaser, free from any right of redemption when public sale is made or when sale is made at any brokers' board. And after deducting all costs and expenses, including reasonable attorneys' fees, from the proceeds of any such sale, the residue shall be applied to the payment of any, either or all liabilities of the undersigned as aforesaid, as said payee or the holder hereof shall elect, returning the overplus to the undersigned; and in case the proceeds of such sale or sales shall not cover the principal, in-

terest and expenses, the undersigned engages to pay the deficiency forthwith after such sale or sales with legal interest. If this note be signed by more than one person, every obligation of the undersigned shall be joint and several.''

At the time of the execution of the agreement and the note, plaintiff delivered to defendants as collateral the mortgage bonds described in the agreement and in the note. Osborn & Lange, Inc., insurance brokers having offices in Chicago, were attempting to adjust the claim on the earnings insurance policy with the British insurance companies, and had, therefore, previous to the execution of the note, sent the said policy to its London correspondents. The navigation company, by Leathem D. Smith, its president, not having on hand the said earnings insurance policy, on August 8, 1936, sent the following letter to Osborn & Lange, Inc.:

''You are hereby requested and directed to pay to the Material Service Corporation, 33 N. LaSalle Street, Chicago, Illinois, from the proceeds of the 'Earnings Insurance' on the motorship 'Material Service,' when, as, and if paid, the sum of $18,000.00 plus interest thereon at the rate of 6% per annum from August 7, 1936. Our interest in the 'Earnings Insurance' policies has been assigned to the Material Service Corporation as security for the payment of the above amount.'' These insurance brokers wrote the navigation company as follows:

''We have your favor of the 8th instant constituting assignment of $18,000 plus interest, in favor of the Material Service Corporation, payable out of Total Loss Earnings. We are taking due note of this, subject of course to claim being collected under this type of insurance.'' On October 5, 1936, the navigation company wrote defendant corporation:

''In reference to earnings policy # L13434 in the amount of $50,000, which was pledged with you as collateral to our note of August 7, 1936, in the amount of

$18,000. We are enclosing copy of this letter to Osborn & Lange, brokers, requesting them to acknowledge receipt of same to you, with their further advices that this $18,000 assignment will be recognized by them, when, as, and if paid, as in accordance with our letter of August 8, 1936, to them, and, further, that they will continue to recognize said assignment until released by yourselves." On October 5, 1936, the navigation company wrote Osborn & Lange, Inc., as follows:

"Confirming our telephone conversation of Saturday regarding our assignment of $18,000 in earning policy on the M. S. Material Service to Material Service Corporation. We are enclosing copy of our letter to them and request that you write them acknowledging same and that you will follow said instructions." On the same day, October 5, 1936, the navigation company wrote defendant corporation the following:

"In reference to earnings policy # L13434 in the amount of $50,000 which was pledged with you as collateral to our note of August 7, 1936, in the amount of $18,000. We are enclosing copy of this letter to Osborn & Lange, brokers, requesting them to acknowledge receipt of same to you, with their further advices that this $18,000 assignment will be recognized by them, when, as, and if paid, as in accordance with our letter of August 8, 1936, to them, and, further, that they will continue to recognize said assignment until released by yourselves." On October 12, 1936, the insurance brokers wrote a letter to defendant corporation in which they quoted the letter written to them by the navigation company under date of August 8, 1936. The letter concludes:

"We hereby beg to confirm that unless and until this assignment is released by you, it will be recognized by us, if and when claim under Earnings Policies is collected. These policies were received by us and are now in the hands of our London correspondents." At the time of the execution of the note, plaintiff informed

Henry Crown that he intended to take action to collect on the insurance policies. He subsequently instituted suit against the American companies in the federal district court at Milwaukee. He also commenced action on the earnings policy in the federal district court at Chicago against the English companies. Plaintiff lost in the District Court at Milwaukee and appealed to the circuit court of appeals in May 1938, which court affirmed the district court. The business relations between the plaintiff and his two corporations and the defendant were not running very satisfactorily. Four separate agreements were made, of which three agreements dated January 20, 1937, April 21, 1937, and December 29, 1937, were between the steamship company and defendant corporation, and the fourth of which contracts was dated December 30, 1937, entered into between plaintiff and defendant corporation. However, the parties still continued to disagree. The navigation company was not a party to any of such four agreements. Plaintiff had pledged to defendants a block of 490 shares of stock in the steamship company as collateral on a new note in the sum of $160,000, signed by plaintiff, in accordance with the provisions of the settlement agreement of December 30, 1937. Defendants sold the stock to Captain William Nicholson of Ecorse, Michigan. Plaintiff claimed that this sale embarrassed him and jeopardized his management and control of the operations of the vessel "Sinaloa." Plaintiff contended that thereby defendants had breached their contract. Defendants maintained that they had a right to make the sale. This controversy was one of the chief difficulties between plaintiff and defendants. On April 15, 1938, plaintiff retained the law firm of Kirkland, Fleming, Green, Martin & Ellis to represent him in his controversy with defendants. Joseph H. Pleck, a member of that law firm, was from Sturgeon Bay, plaintiff's home town, and had active charge of the case. Pleck commenced negotiations

with the defendants and their attorney, Harold R. Schradzke, on April 15, 1938. Numerous conferences were had between the parties and Henry Crown informed Pleck at several of these conferences that he desired to sever all business connections and transactions with plaintiff, to make a complete settlement with plaintiff, and to "wipe the slate clean," and that he would cancel the two notes and return all of the collateral pertaining thereto to Smith. At the time of these negotiations, the steamship company was indebted to various creditors in the sum of $20,008.28. Among such creditors was the Leathem D. Smith Coal & Shipbuilding Company, which was controlled by plaintiff and the Sturgeon Bay attorney for the plaintiff, Thomas A. Sanderson. On July 7, 1938, defendant corporation, by its president, Henry Crown, wrote to Pleck, contending that he had a right to sell the 490 shares of stock to Captain Nicholson, and proposed that if plaintiff would release defendants from all claims, the defendant corporation would return to him (Smith) "all of his notes. We will give him the Navigation Company bonds, notes and scrip. In addition, if he honestly and earnestly works on the matter of reducing the old accounts, we will both pay him for his time and expenses in so doing, and, based upon his results, make a reasonable adjustment by way of commission." On July 26, 1938, Pleck wrote to defendants, agreeing to accept their proposal, excepting that he desired them to pay an additional sum of $5,000, and compensation for plaintiff's services in a consulting capacity. Shortly thereafter Henry Crown met with Pleck and another member of his firm, Thomas B. Martineau. The result of the conferences was that Henry Crown proposed to settle on the basis of his letter of July 7, 1938, excepting that in lieu of paying plaintiff for his time and expenses in settling the accounts of the steamship company, he would put up a fund of $20,000, and plaintiff could proceed to work out a compromise of

the obligations of the steamship company amounting to $20,008.28, and after obtaining full releases of such obligations, the balance remaining out of the $20,000 would go to the plaintiff Smith. This proposal was not accepted. Pleck was going away on a vacation and Martineau came into the case, and his participation in this consultation was the first connection Martineau had with the matter. At this conference Crown again re-iterated that he desired to "wipe the slate clean," and would cancel the two notes and return the collateral per-taining thereto. Pleck then left on his vacation and turned the matter over to Martineau. On the morning of July 29, 1938, Crown informed Martineau that he would increase the fund to $22,500 and that Smith would be entitled to the balance remaining after ob-taining full releases of all obligations of the steamship company, otherwise the agreement would be the same as set forth in his letter of July 7, 1938, and in accord-ance with the proposal made during his conference with Pleck and Martineau several days prior to July 29, 1938. Martineau immediately wired plaintiff at Stur-geon Bay, telling him about the new proposal, and in reply received a letter from Sanderson, plaintiff's Sturgeon Bay attorney. On August 3, 1938, Martineau called Henry Crown on the telephone and informed him of Sanderson's letter and its contents, and on the same day he (Martineau) wrote Henry Crown a letter in which he quoted *verbatim* Sanderson's letter. Mr. Sanderson, in his letter, stated that after consulting with his client, he (Smith) agreed to adjust the matter on the basis that he would be supplied with $22,500 to adjust the accounts of the steamship company. The following are material portions of this letter:

"*3rd:* Mr. Smith's note held by the Material Service Corporation is to be cancelled and delivered to him; all of the collateral previously deposited by him as security for said note is to be delivered to him, and the collateral the Material Service Corporation holds as security for

the Smith-Putnam Navigation Company note is to be returned to him.

"*4th:* A release by the Material Service Corporation of any and all claims of any kind or nature that they have against Mr. Smith, and I assume a mutual release by him to them, should be given. This is suggested because so many contracts have been drawn, so many papers have been signed, that it is difficult to tell just what liability, direct or indirect, there may be existent upon the part of Mr. Smith to the Material Service Corporation.

"In other words, this settlement is predicated on the thought that the adjustment by Mr. Smith of these accounts is for the purpose of enabling him to recoup some of his claim out of this adjustment, and he expects to have the cooperation of Mr. Crown to the extent of enabling him to salvage as much as possible in this way on his stock loss." After the receipt by Crown of Martineau's letter it was agreed between Martineau and Henry Crown that the attorney for the defendant corporation would draw up a memorandum of the agreement and submit it to Martineau. Schradzke, attorney for the defendant corporation, accordingly submitted a written memorandum of the agreement to Martineau, who kept the same for a day or two, made pencil interlineations, drew up the revised agreement and submitted it to Schradzke. This revised agreement was not materially different from the memorandum drafted by Schradzke. The agreement was signed by the defendants and plaintiff on August 12, 1938. This agreement was between Leathem D. Smith and the defendants. The negotiations leading up to this agreement and the agreement itself show that the defendants treated Smith as the owner of all the claims against them and as the obligor of all the moneys due them by Smith individually and by the companies with which Smith was associated. The preamble of this agreement recites:

"That Whereas, the parties hereunto heretofore made and entered into Memoranda of Agreement dated January 20, 1937, April 21, 1937, December 29, 1937, and December 30, 1937 (the latter agreement not carrying the year date '1937'), all of which agreements are by this reference made part hereof and all of which said agreements refer to certain contractual obligations of each of the parties hereunto to the other, respecting and concerning their respective rights and interests in and to the steam vessel 'Sinaloa' and the common capital stock and preferred ship mortgage bonds of the Leathem D. Smith Steamship Company, as well as other matters and things, and

"Whereas, it has presently been contended by Smith that the Corporation has breached one or all of the above referred to contracts and particularly the contract of December 30, 1937, to the injury and damage of the said Smith, and

"Whereas, Corporation denies that it has breached any prcvisions of any of the said contracts on its part to be performed, and

"Whereas, the parties hereto desire amicably to settle and adjust their differences and mutually to release one another from the obligations imposed upon each by the terms of any and all of the said contracts, and from any and all supposed or real breaches of each or either of the parties of any of the legal intendments, or legal implications of the said contracts and to release each the other from any and all claims which either may or might have against the other or others arising from whatsoever source." The first, second and third clauses of the agreement read:

"(1) For and in consideration of these presents and the matters and things herein contained, the parties hereto declare cancelled, terminated, satisfied and released each and all of the above referred to contracts, save and except as to executed matters, and each party hereunto acknowledges to the other the cancellation

and release of the said contracts and the matters and things therein imposed upon each and either party hereto by each of the said contracts and by each and every provision of each of said contracts.

"(2) Corporation, Henry Crown and Irving Crown, jointly and severally, release Smith from any and all obligations, either as set forth in the said referred to contracts, by Smith to be performed, or contained in any other contract or memorandum of agreement or writing whatsoever, and from any verbal agreement or contract imposing any performance by Smith for the benefit of the Corporation, and the Crowns, or either of them, and declare hereby to be released and satisfied any and all claims which they or any one or more of them may or might have now or have had heretofore against the said Smith for any matter or thing, from the beginning of the world down to the date hereof, and further release the said Smith from any and all obligations, either by note or by open account, or for damages or otherwise, which they or any of them may or might have had or now have against the said Smith.

"(3) Corporation, contemporaneous with the execution hereof, returns to the said Smith all of his note obligations, marked satisfied, particularly the certain judgment collateral note dated January 19, 1937, in the sum of $160,000, together with the certain note in the sum of $18,000 dated August 7, 1936, together with the following items." While the $160,000 note was signed by plaintiff, the $18,000 note was signed by the navigation company and not by plaintiff. Although the agreement of August 12, 1938 was with plaintiff and not with the navigation company, nevertheless, the defendants in the contract treated the note as the note of plaintiff and promised to return the note and to mark it "satisfied." The items to be so returned are specified under clause 3, subclauses (a) to (f) inclusive. Subclause (a) listed certain gold notes issued by the navigation company and secured by a junior

mortgage on the motorship "Material Service"; subclause (b) the interest coupons on such notes; subclause (c) certain scrip or notes indorsed in blank by plaintiff; subclause (d) a certificate representing 177 shares of the preferred stock of the navigation company, indorsed in blank by plaintiff; subclause (e) the right to accrued and unpaid dividends upon said 177 shares of stock of the navigation company; and subclause (f) seven first mortgage sinking fund gold bonds, with interest coupons attached, four additional bonds of the same issue and nine junior preferred mortgage bonds on the motorship "Material Service." The agreement of August 12, 1938 did not specifically mention the $50,000 earnings insurance policy. In clause 7 of such agreement plaintiff agreed that the 490 shares of the common capital stock of the steamship company was on December 30, 1937, the sole and unrestricted property of the defendant corporation, and he disclaimed any right, title or interest in said shares and in the vessel "Sinaloa" or the first preferred mortgage bonds on such vessel. The two notes, namely, the $160,000 note and the $18,000 note were duly canceled and "returned" to Smith, as contemplated in the agreement. Defendants also delivered to Smith all of the collateral specifically mentioned in subclauses (a) to (f) inclusive. Plaintiff, on the letterhead of Schradzke, attorney for defendant corporation, wrote a letter to that corporation acknowledging that "each and all of the provisions and obligations contained in the certain agreement dated August 12, 1938, by and between Leathem D. Smith (myself), Material Service Corporation, and Henry Crown and Irving Crown have been faithfully and fully performed by Material Service Corporation, Henry Crown and Irving Crown." The letter is dated in typewriting October 20, 1938, and in longhand November 4, 1938. Below the signatures to the original contract of August 12, 1938, appears a receipt signed by Thomas A. Sander-

son, reading: "Aug. 12, 1938 Received for Leathem D. Smith the notes, bonds and collateral set forth in paragraph (3) of the above contract." On December 23, 1938, Osborn & Lange, Inc. wrote defendant corporation, calling attention to the fact that the underwriters refused to recognize any liability under their policies with the result that a suit against some of them was instituted in the district court at Milwaukee and another suit in the district court at Chicago; that in the spring of 1937 the district court at Milwaukee entered a decree finding that the policies were void from their inception because of the unseaworthiness of the motorship "Material Service," that on appeal this decree was affirmed by the circuit court of appeals; that the attorneys who handled the case for the owner, namely, Robert Branand, Jr., of Chicago, Thomas A. Sanderson of Sturgeon Bay and Fred L. Leckie of Cleveland, were of the opinion that the decision rendered by the circuit court of appeals would prevent any recovery in the suit pending in Chicago; that in the Milwaukee suit the underwriters were put to an enormous expense; that as a result of this experience, Mr. Branand was enabled to negotiate a settlement of the case pending in Chicago, on the basis of 25 per cent of the face of the policies. The letter stated that defendant corporation had an assignment of the earnings insurance to the extent of $18,000 and interest, and that after the payment of attorneys' fees and expenses the defendant would receive "something in excess of $9,000," and concluded by suggesting that if the offer were not accepted, defendant would not, in all probability, receive anything, and asked defendant to instruct them in writing as to what to do. On December 27, 1938, defendant corporation wrote to the insurance brokers, consenting to the proposed settlement as outlined in the letter. On March 29, 1939, the insurance brokers drew a check payable to the order of defendant corporation in the sum of $8,802.08. On the reverse side appears the notation,

"In full settlement of collections on Earnings Insurance on M. S. 'Material Service' as per assignment of Leathem Smith-Putnam Navigation Co. of 8/8/36." Defendant corporation indorsed the check and deposited it and the same was credited to its account. At a special meeting of the board of directors of the navigation company held on June 8, 1939, the president and secretary-treasurer were authorized and directed to execute and deliver to Smith, an assignment of the interest of the navigation company in and to any moneys due on the proceeds of the earnings insurance on the motorship "Material Service" up to the sum of $18,000, also any interest in the proceeds in said earnings insurance policy received by the Material Service Corporation, also any claim the navigation company had against the Material Service Corporation on account of the sum of approximately $8,800 received as the proceeds of said earnings insurance. Defendant Henry Crown, also a stockholder in the navigation company, objected to this action and voted "No." The navigation company, by plaintiff as president, and with the attestation of the secretary-treasurer, signed, sealed and delivered to himself as an individual an assignment in accordance with the authorization of the board of directors. On June 27, 1939, plaintiff Leathem D. Smith filed his complaint against the Material Service Corporation, Henry Crown and Irving Crown. The complaint alleged the making of a loan by the corporation to the navigation company in the sum of $18,000 and the giving of a note evidencing the same, secured by certain collateral described in said note, including the earnings policy. It further alleged that controversies arose between the parties to the various contracts entered into between defendant corporation, plaintiff and the steamship company, which the parties desired to settle, and that on August 12, 1938, the written contract setting forth the terms of the settlement was executed by plaintiff and the defendants. The com-

plaint alleges that among the "oral agreements as to the settlement of the controversies" was the "agreement" of the corporation to surrender to the plaintiff said $18,000 note and other notes and collateral securing the same; that the collateral so to be surrendered was listed in detail in seven subclauses of paragraph 12 of the complaint. The first six subclauses described certain gold notes, interest coupons, scrip and shares of stock. The seventh subclause alleged that the "oral agreement" on which the agreement was based, also provided for an assignment to plaintiff "of the insurance of said Leathem D. Smith-Putnam Navigation Company in and to said earnings insurance policies on the motorship 'Material Service' so delivered by said Leathem D. Smith-Putnam Navigation Company, under said contract of August 7, 1936 and which was then and there held as collateral upon said note of $18,000 signed by said Leathem D. Smith-Putnam Navigation Company." The complaint further alleges that in preparing the agreement of August 12, 1938, by inadvertence and by the mutual mistake of the parties, the agreement of defendant corporation that it would assign to plaintiff the insurance of the navigation company in and to said earnings insurance policies then and there held by defendant corporation as collateral upon the $18,000 note, signed by the navigation company, was not written into the agreement; that it was the intent of the parties to the agreement that the collateral note of the navigation company be marked "Paid" and all of the property or choses in action held by the defendant corporation as collateral for the said note be turned over, delivered and assigned to plaintiff, and that it was only by inadvertence and the mutual mistake of the parties to the agreement that the written agreement signed by the parties failed to assign to plaintiff said earnings insurance policies so held as collateral. The complaint avers that the money received by defendant corporation as the proceeds of the

earnings insurance policies was really the money of plaintiff, and that defendant wrongfully received the same; that plaintiff had made demand upon defendant for the payment to him of said money, and that defendant had failed and refused so to do. The complaint concluded by praying that the court reform the agreement of August 12, 1938, by inserting a clause whereby the defendant corporation would assign to plaintiff the interest of the navigation company in the earnings insurance policies; that upon such reformation plaintiff be decreed to be entitled to the proceeds of the earnings insurance policies; that an accounting be had as to the amount of money received by defendants as the proceeds of such earnings insurance policies, and that upon such an accounting the plaintiff recover a judgment as at law for the amount so found to have been received by the defendants, plus interest. Defendants denied that any agreement had been made between the parties to the contract of August 12, 1938, other than the agreement therein set forth. They further averred that it was not within the contemplation of either of the parties that there should be an assignment to the plaintiff of the earnings insurance policies. The cause was referred to the master in chancery, who found for the plaintiff. Defendant filed objections to his report, which objections were allowed to stand as exceptions. The chancellor overruled the exceptions and entered a decree directing that the written agreement of August 12, 1938 be reformed so as to provide for the return to the plaintiff of the earnings insurance policies, together with an assignment and cancellation of assignment from Leathem Smith-Putnam Navigation Company dated August 8, 1936, in and by which the proceeds of the earnings insurance was assigned to said Material Service Corporation. The decree further ordered that plaintiff recover from the Material Service Corporation the sum of $8,802.08, together with

interest thereon from March 30, 1939, and a judgment as at law was entered in favor of plaintiff and against defendant corporation in the sum of $9,590.07. The decree also fixed the master's fees at the sum of $620.75, and directed that plaintiff recover from the defendant all taxable costs, including the master's fees so fixed. Defendants prosecute this appeal and ask that the decree be reversed and that the cause be remanded with directions to dismiss the complaint for want of equity.

The theory of plaintiff is that the defendants in the negotiations for the settlement of the controversies between the parties agreed, among other things, to deliver to the plaintiff certain securities and the said earnings insurance policy, and that through inadvertence and by the mutual mistake of the parties such agreement was omitted from the contract of August 12, 1938; that because of such mistake the plaintiff is entitled to have the contract reformed so as to include therein said alleged agreement and to recover from the Material Service Corporation the proceeds of the claim under the earnings policy. Defendants contend that there was no agreement during the negotiations which culminated in the August 12, 1938 contract, or at any other time, to turn over the earnings insurance policy or any interest or part of it, to the plaintiff or anyone; that the written settlement contract of August 12, 1938 contains all of the agreements of the parties; that the plaintiff wholly failed to prove (because the fact did not exist) that any such provision as the decree directs to be inserted in the contract was considered and agreed upon by the parties to the contract, and that the court committed error in fixing the amount of master's fees. The master found that the plaintiff, Smith, and defendants, the parties to the agreement of August 12, 1938, intended to settle, compromise and dispose of each and every of the various business transactions and controversies existing between them; that

plaintiff was to release the defendants from all claims that he had or claimed to have against the defendants; that defendants were to cancel and return to plaintiff the $160,000 note and the $18,000 note, together with all of the collateral pertaining to said notes, excepting the 490 shares of stock of the steamship company, which prior to that time had been sold by defendants to Captain Nicholson; that Smith was to obtain the balance of the fund of $22,500 remaining therein, after having secured full releases of the obligations due by the steamship company to its creditors, and in the words of the defendant, Henry Crown, it was the intention of the parties to said agreement to "wipe the slate clean," and that due to a mutual oversight of the parties and their attorneys they inadvertently omitted from the agreement a provision to cancel the assignment of the $50,000 earnings insurance policy. The master concluded that the evidence was convincing and showed beyond a reasonable doubt that it was the mutual intent of the parties to cancel the insurance assignment, and that the ownership of the earnings insurance policy vest in the plaintiff and that the omission of that provision in the written agreement was a mutual mistake of fact by the parties thereto.

The first point urged by defendants is that plaintiff failed to prove by clear and convincing evidence that he is entitled to the relief sought. Plaintiff argues that he did prove by clear and convincing evidence that he is entitled to the relief granted. Both parties cite the case of *Tope v. Tope,* 370 Ill. 187. The law is that to reform an instrument on the ground of mistake, it must be a mistake with respect to the facts, must be mutual and must exist at the time of the execution of the instrument in question. In *Matthews v. Whitethorn,* 220 Ill. 36, the court said that the mutuality in mistake must relate to the time of the execution of the instrument and show at that particular time that the parties

intended to say a certain thing, and, by mistake, expressed another. In the *Tope* case, the court said:

"The evidence required to reform a written instrument must leave no reasonable doubt as to the mutual intention of the parties. A preponderance of the evidence is not sufficient. The rule has been expressed in many ways. In all cases there should be satisfactory evidence before a deed will be reformed." In *Goltra v. Sanasack,* 53 Ill. 456, the court said:

"The mistake must be satisfactorily established, and not inferred from loose, doubtful or unsatisfactory evidence." In *Patterson v. Patterson,* 251 Ill. 153, the court holds that the facts upon which reformation may be granted should be so convincing as to leave no reasonable doubt in the mind of the court, and that the remedy of reformation on account of alleged mistake is never granted upon a probability nor upon a mere preponderance of the evidence, but only upon evidence amounting to a certainty. The latest pronouncement on this subject by our Supreme Court appears in the case of *Harley v. Magnolia Petroleum Co.,* 378 Ill. 19, where the court said (27):

"Counsel agree that a mutual mistake is prerequisite to the right to reform the deeds involved here, and that the record must show affirmatively that both parties understood alike the agreement that they made and that the instrument as executed failed to express their common understanding and intention. (*Schaefer v. Henze,* 337 Ill. 41.) Where parties to an agreement are ignorant of facts which, if known, would have caused a different contract, the remedy is rescission and not reformation. (*Hoops v. Fitzgerald,* 204 Ill. 325.) The query in such a case is: Did the instrument, when executed, represent the actual contract of the parties? (*Jacobs v. Wilkerson,* 373 Ill. 545.) In this case the grantor and the grantees in the mineral deeds knew of the existing lease and contracted subject to it; all

were then conscious that they were ignorant of its terms, including the *pro rata* provisions.

"Mistakes are generally divided into two groups, first, those fundamental in character, relating to an essential element of the contract which prevent a meeting of the minds of the parties and so no agreement is made. These generally have to do with such matters as the existence and identity of the subject matter, errors as to price, quantity, and the like. In the other class of mistakes an actual good-faith understanding is reached but through some error, not expressed, the agreement reduced to writing is not the actual agreement. The former of these classes constitutes ground for rescission but not reformation, while the latter may be reformed. An action to reform a written agreement rests upon the theory that the parties came to an understanding, but in reducing it to writing, through mutual mistake, or through mistake of one side and fraud on the other, some provision agreed upon was omitted, and the action is to so change the instrument as written as to conform it to the contract agreed upon, by inserting the provisions omitted or striking out the one inserted by mutual mistake. Equity cannot make a new agreement for the parties under the color of reforming the one made by them, or add a provision which they never agreed upon." The parties are not in disagreement as to the law pertaining to this subject. Defendants insist that the letter written by Henry Crown on July 7, 1938, was the basis of the settlement of the controversies. They call attention to the fact that this letter, written to plaintiff's attorneys, after offering to deliver to plaintiff all of his notes, also stated that defendants would give him the navigation company bonds, notes and scrip, and in addition they would pay him for his time and expenses in reducing the accounts of the steamship company. Defendants stress the fact that this letter informed the plaintiff that "further than this it is impossible for us to go."

Defendants maintain that plaintiff apparently was satisfied with the offer so made, except as to the amount to be deposited to pay the claims of the steamship company, and that after further negotiations Mr. Crown informed the plaintiff on July 29, 1938 that he would increase the fund to be used by the plaintiff in settling the steamship company's accounts to $22,500. Mr. Crown further stated that otherwise his offer of settlement would be as set forth in his letter of July 7, 1938. Defendants call attention to the fact that a draft of the settlement contract was prepared by their attorney, Mr. Schradzke, who submitted it to the attorneys for plaintiff; that the latter made changes therein to which Mr. Schradzke agreed; that the contract was then prepared and a copy thereof forwarded to plaintiff by his Chicago attorneys; that plaintiff testified that before signing the contract he read the same and checked the list of collateral set forth in the contract with the list of collateral he had in his possession to make certain he was getting all of the collateral the corporation had, and that thereafter the contract was signed. Defendants also state that on August 12, 1938, all of the securities listed in the contract were delivered by the corporation to Mr. Sanderson, plaintiff's attorney, who acknowledged receipt of the same on an executed copy of the contract, and that on November 4, 1938, plaintiff wrote a letter to the corporation in which he acknowledged performance by defendants of all their obligations thereunder. Defendants insist that plaintiff utterly failed to prove that any such provision as the decree directs to be inserted in the contract was considered and agreed upon by the parties to the contract, and declare that the earnings policy was not deposited with the corporation as collateral for the $18,000 note but at all times was in the possession or under the control of plaintiff, and that the attorneys who represented plaintiff in their negotiations did not know of the policy and gave it no thought; furthermore,

that the corporation stated in its letter of July 7, 1938, specifically what it was willing to turn over to defendants, and that the policy was not included. Defendants point out that the master found that the parties "overlooked" the policy and that such finding is inconsistent with his further finding that it was the intention of the parties that the ownership of the policy should vest in the plaintiff, and call attention to the fact that plaintiff testified that he "checked over the list of collateral in the contract with the list of collateral he knew the Material Service Corporation had in their possession to see if he got back everything in the way of collateral which they had." They state that at the time he so checked over the list of collateral he had the note before him and that such note recited that the earnings policy was part of the collateral therefor. Defendants argue that had it been agreed that the policy was to be returned, or had plaintiff believed when he (plaintiff) signed the contract that there was such an agreement, he would have discovered then and there that such agreement had been omitted from the contract, and that the fact that he signed the contract only after checking over the collateral recited in the contract with the collateral he knew the company had, is convincing proof that no such agreement as he alleges in his complaint was made. Plaintiff testified that it was his intention when he signed the contract that all the collateral, including the policy, should be turned over to him. Henry Crown testified that the paragraph in the letter of July 7, 1938, in which was listed what was to be turned over to the plaintiff, included all he had agreed should be turned over, and that it was his intention when the $18,000 note was turned over to retain all rights the corporation had in the earnings policy. Mr. Crown further testified as to what he intended to turn over to the plaintiff and the policy is not included therein, and that the contract truly, completely and fully expresses all the terms and conditions upon which he was

willing to settle the controversies between the parties. Defendants suggest that the only basis that occurs to them upon which the master could reach his conclusions is that he believed, had the parties given any thought to the policy, they would have agreed that it should be turned over to the plaintiff. They correctly point out that there is a vast difference between a mistake in the preparation of a written contract because of which such contract does not fully and truly express the agreements and intentions of the parties, and a mistake of the parties in not agreeing upon a matter which they might have agreed upon, and that a court of equity may reform an instrument by inserting a provision therein as to which the parties have agreed and by mistake have omitted, but it cannot make a new contract for the parties by inserting therein a provision as to which the parties have not agreed. They assert that the earnings policy at all times was in the possession or under the control of the navigation company, of which plaintiff was president; that the navigation company brought suit on the policy and controlled the prosecution thereof, and that there is no competent evidence that the policy was actually assigned to the corporation, and that in any event there was no reason why the plaintiff should have insisted that it should have been turned over to him when at all times it was either in his possession or under his control. Defendant calls attention to the fact that the letter of August 8, 1936 was addressed to Osborn & Lange, Inc., and not to defendant corporation; that this letter was at no time in the possession of defendants and that so far as is shown by the record the defendants did not know of the existence of the letter until October 5, 1936, when the navigation company wrote to defendant corporation advising it thereof. They say that the letters of the navigation company of August 8, 1936 and October 5, 1936 constituted an absolute assignment to the corporation of a part of the proceeds of the claim under

the policy; that the letter of Osborn & Lange, Inc. of October 12, 1938, to the corporation, accepted such assignment; that all the rights of the navigation company, in such part of the proceeds as were assigned, thereupon ceased, and that the assignment was a conditional payment of an indebtedness evidenced by the note which the corporation at any time could elect to make an actual payment in full or in part. Defendants contend that when they marked the $18,000 note "Paid" and delivered the securities described therein to the plaintiff, they elected to accept the assignment of part of the proceeds of the claim and the promise of Osborn & Lange, Inc. to recognize such assignment as payment in full of such indebtedness; that the note having been so paid, all obligations thereunder were at an end, but the corporation continued to have its rights under the assignment; that the situation was then the same as though the corporation had accepted a check on a bank in full payment of the note, and that the obligation of Osborn & Lange, Inc. was thereafter held by the corporation in lieu of the obligation of the navigation company under the note. They also argue that the master erred in refusing to consider the testimony of the plaintiff and defendant Henry Crown as to their respective intentions at the time of the signing of the contract of August 12, 1938. Plaintiff testified that it was his intention when he signed the agreement that all the collateral, which included the earnings policy as collateral, should be turned over to him. Henry Crown testified that at the time of the signing of the contract he intended to turn over certain bonds, scrip, coupons and the notes, but that it was his intention when he turned the note over to the plaintiff to retain all rights which the corporation then had in and to the earnings policy. Defendants maintain that such testimony clearly shows that there was no meeting of the minds at the time of the execution of such contract, and allege that the actions of the plaintiff

subsequent to the execution of the contract clearly and convincingly show that no agreement whatsoever was made by the parties for the transfer of the earnings policy to the plaintiff, or for the release or surrender to him of the assignment to the defendant corporation of part of the proceeds of the claim which had matured thereunder. In support of this argument defendants say that the actions of the parties show clearly that no agreement was made for the delivery of the policy to plaintiff, or the delivery and assignment of the assignment of August 8, 1936; that the controversies between the parties arose because of the contracts made in 1937 and had nothing to do with the $18,000 indebtedness; that the parties checked over the list of the collateral and were satisfied that Mr. Sanderson, one of plaintiff's attorneys, knew of the policy and knew of the suit which had been brought, having participated therein; that he had been advised of the proposed settlement between the parties, and on behalf of the plaintiff approved the final offer of the defendant; that undoubtedly as attorney for the plaintiff he knew the right of the corporation in the proceeds of the claim; that on August 12, 1938, he acknowledged in writing the receipt from the corporation of all the notes, bonds and collateral set forth in paragraph 3 of the contract; that had there been any agreement between the parties that the policy was to be delivered to the plaintiff and the rights of the corporation in the proceeds of the claim surrendered, he would have known about it, and as a lawyer for plaintiff would have then and there objected that the plaintiff was not receiving all that the defendant had agreed to deliver. Defendants say that Sanderson would have asked for a release of the assignment and would have called attention to the fact that the contract did not contain any provision for such release. They insist that the fact that he did not do so is proof that no agreement was made or intended to be made. Defendants also lay stress on the action of

plaintiff in acknowledging to defendants in writing on November 4, 1938, that all their obligations under the contract had been performed, and that at that time he had nearly three months to recall to his mind the supposed agreement as to the surrender of the rights of the corporation in the proceeds of the claim. They also state that the suit on the claim which accrued on the earnings policy was pending at the time of the negotiations between the parties and throughout the year 1938; that on December 23, 1938, the insurance brokers wrote the corporation stating the status of such suit and the offer of settlement which the insurers had made; that in that letter they gave the opinion of the navigation company's attorneys, one of whom was Mr. Sanderson, advising the acceptance of the offer. They infer that negotiations between the navigation company and the insurers for a settlement of the claim must have been entered into prior to December 23, 1938, and suggest that as the plaintiff was president of the navigation company, he must have known of the letter, and that the settlement could not have been made without his knowledge. They urge that plaintiff at all times had full knowledge of the facts connected with the assignment and with the negotiations for a settlement; that he knew the consent of defendant corporation to such proposed settlement had been asked and given, and that at no time did he make a demand upon defendants for the delivery or surrender of the assignment, or notify Osborn & Lange, Inc. that they should no longer recognize the assignment, and that his failure to take any action to have the assignment released or surrendered until after Osborn & Lange, Inc. had paid the proceeds of the claim to the corporation is clear and convincing evidence that no such provision as the decree directs to be inserted in the contract was ever considered or agreed upon by the parties.

Plaintiff answers that the basic agreement between the parties to the settlement agreement was that all

matters between the parties should be settled, released and discharged, and that if all obligations and matters between the parties were to be settled the earnings policy assignment was to be disposed of in some manner by the settlement between the parties, and asserts that there was no agreement or understanding between the partners that the Material Service Corporation should retain the earnings policy. Plaintiff insists that the settlement, assignment, cancellation or payment of the $18,000 note released the collateral on this note, and that the defendant corporation no longer had any legal rights in such collateral, which included the assignment of the earnings policy, and states that the mutual agreement between the parties arrived at prior to the execution of the written agreement, was that all collateral on the $18,000 collateral note was to be turned over. As to the reasons why the mistake occurred, plaintiff suggests that Schradzke, attorney for defendants, testified that he never saw the $18,000 collateral note; that Pleck did not know anything about the insurance policy at the time of the negotiations, and that Pleck did not see the $18,000 note until 1939; that Martineau did not know what collateral there was in connection with any notes that were being settled; that Martineau did not give the collateral any thought at all in making the revision in the contract; that Smith testified that when he read the settlement agreement of August 12, 1938, he did not notice that there wasn't anything in the contract with reference to the earnings insurance policy; that the reason he did not notice it was because he checked the list of collateral recited in the contract which he knew the Material Service Corporation had in its possession to see if he got back everything in the way of collateral; that the Material Service Corporation did not have the policy so that the policy could not be returned; that all the Material Service Corporation had was an assignment of the policy and that the policy had been sent to the insurers

in London in September 1936. Plaintiff urges that it is apparent that the assignment of the policy was just overlooked and that the settlement of all matters really was intended to cover all collateral on the $18,000 note which would include the assignment of the earnings policy. Plaintiff declares that the letter of July 7, 1938 was not the basis of the settlement agreement; that the parties did not sign the settlement agreement until August 12, 1938, over a month later, and negotiations were continuing until the letter from plaintiff's attorney to Crown dated August 3, 1938. This letter quoted the Sanderson letter. Plaintiff maintains that it was not until Crown had agreed to the proposals in the Sanderson letter that any action was taken to draft the agreement, and that the testimony of Martineau is positive that Crown accepted all the suggestions Sanderson made and asked Schradzke to draft the settlement. Replying to defendants' statement that the earnings policy was not deposited with the corporation as collateral, but at all times was in the possession or under the control of plaintiff, the latter states that while it is true that the earnings policy itself was never in the possession of the defendants, the contract of August 7, 1936, wherein the $18,000 loan was arranged, provided that an assignment of said insurance policy should be made to the Material Service Corporation as collateral on the said $18,000 note, and that all things necessary, including the execution of any instruments for the purpose of perfecting such an assignment of said earnings insurance, should be done; that it was pursuant to the agreement of August 7, 1936 that the navigation company wrote Osborn & Lange, Inc. that the interest of the navigation company in the earnings policy had been assigned to the Material Service Corporation as security for the payment of the $18,000 note, and that under these circumstances the assignment of the earnings policy took the place of the delivery of the policy, which at that time was in London.

Plaintiff also maintains that the assignment was treated as collateral to the $18,000 note; that the correspondence between the parties at the time shows that the assignment delivered to the insurance brokers was treated as the best delivery of the earnings policy that could be made; that the assignment of the proceeds of the policy was just the same as the delivery of the policy itself which could not be manually delivered. In answering defendants' contention that the master's finding that the parties overlooked the policy is inconsistent with his further finding that it was the intention of the parties that the ownership of the policy should vest in plaintiff, the latter points out that when the parties agreed that the settlement agreement of August 12, 1938 should include a settlement of all matters between the parties, that would include the policy. Plaintiff states that the basic agreement to include all matters in the settlement would necessarily mean that the parties intended to include the policy, and that this justifies the master's conclusion that the parties "overlooked" mentioning the policy. Plaintiff declares that the testimony of defendants' witnesses as to what their intentions were with reference to the retention of the earnings policy is not controlling and that proof of mutual mistake does not depend upon the attitude of the parties at the time of the trial.

In reply to defendants' contention that when they marked the $18,000 note "Paid" and delivered the securities described therein to plaintiff, they elected to accept the assignment of part of the proceeds of the claim and the promise of Osborn & Lange, Inc. to recognize such assignment as payment in full of said indebtedness, plaintiff asserts that the assignment of the earnings policy was not a conditional payment of the indebtedness evidenced by the $18,000 note. Plaintiff points out that this contention amounts to a statement that Crown and Schradzke deliberately made no

mention of the policy in all their negotiations so that subsequently the claim could be made by the defendants; that the settlement agreement settled all matters between the parties; that in the process of the negotiations the defendants silently elected without any notice to anybody to keep the earnings policy and mark the note for $18,000 which was then being discussed, "Paid," all without notice to Pleck or Martineau, who were allowed by defendants to proceed all the way through the negotiations, supposing they were settling a collateral note of $18,000, while the defendants without saying a word about it, were intending to accept the earnings policy in payment of the $18,000 note and return the other collateral on the note. Plaintiff also points out that the settlement agreement states that contemporaneous with the execution of said agreement, the Material Service Corporation returns to Smith all of his note obligations marked "satisfied," particularly the judgment collateral note dated January 19, 1937 for $160,000, together with the note for $18,000 dated August 7, 1936, and the collateral on said $18,000 note. Plaintiff points out that the contract does not contain any reference to any election of defendants that the assignment of the earnings policy should be a payment of the $18,000 note, and maintains that the earnings policy, or the proceeds thereof, was a portion of the collateral on the $18,000 note, and that the interest of defendant, being only a lien, could only be converted into ownership by a sale in accordance with the power of sale contained in the collateral note, or by agreement between the parties. Plaintiff also asserts that there is no evidence that the Material Service Corporation at any time prior to August 12, 1938 elected to accept the assignment of part of the proceeds of the claim on the policy as payment in full of the $18,000 note. Defendants point out that the assignment of August 8, 1936 was directed to Osborn & Lange, Inc., and not to the insurers; that the assignment in no way

affected the insurers; that defendant corporation acquired no rights against the insurers; that the only claim that the corporation had was to moneys actually paid to Osborn & Lange, Inc.; that the assignment of the policy and the assignment of moneys coming into the hands of Osborn & Lange, Inc. were different things, and that therefore, it is not true that the assignment of the proceeds constituted an assignment of the policy, and that the assignment of the proceeds was not a part of the collateral securing the note. Defendants also assert that the Material Service Corporation did not acquire the rights of a pledgee; that the subject matter of the assignment, if and when received by Osborn & Lange, Inc., would be money; that such money was not pledged; that when received by Osborn & Lange, Inc., such money would become the money of the Material Service Corporation and that the navigation company would have no interest in it except to have it applied on the note. Defendants maintain that the accepted assignment amounted to a conditional payment on the note; that the corporation did not have to accept it as payment but could elect to do so at any time, and that when it marked the note "paid" without releasing the assignment, the only inference which could be drawn is that it made such election. Defendants contend that the assignment of August 8, 1936 was not executed in accordance with any provisions of the contract of August 7, 1936, and that the contract contemplated that the navigation company would execute further instruments which would assure the defendant corporation rights under the policy as against the insurers, and point out that no such instrument was thereafter executed, and that the navigation company gave an order, directed not to the insurers, but to its own agents, to whom the insurers would pay the proceeds of the claim under the policy, if such claim should be allowed. Defendants argue that there is a vast difference between the assignment of an insurance policy

and the assignment of moneys which may come into the hands of the assignor's agent as payment of a claim under the policy. They contend that plaintiff brought this suit for his own benefit, upon the express promise made to him, not for the benefit of the navigation company, or because of any rights which may have been assigned to him by the navigation company. The position of defendant is that the assignment of August 8, 1936, and its acceptance by Osborn & Lange, Inc., constituted conditional payment on such indebtedness. Plaintiff insists that his actions subsequent to the execution of the contract of August 12, 1938 are consistent with his position that there was an agreement to return all collateral to the $18,000 note, and he states that it is true that in November 1938, he acknowledged that all of the provisions and obligations of the agreement of August 12, 1938 had been fully and faithfully performed, and that such agreement did not provide for the return of the earnings policy or of the assignment thereof. Plaintiff maintains that at the time he acknowledged such performance he was still under the mistaken idea that he had received all the collateral; that he did not wake up to the fact that he had not received all the collateral until he discovered that defendant corporation had collected on the policy, and that under the circumstances plaintiff's persistence in acknowledging performance of the contract would not in any way alter the fact that there had been a mistake in the original contract of August 12, 1938. He states that the statement that Mr. Sanderson participated in advising the acceptance of the offer of settlement, is without basis; that an examination of the letter of December 23, 1938 shows that Mr. Sanderson was one of the attorneys in the Milwaukee suit, and that nowhere is it stated that Mr. Sanderson was one of the attorneys in the Chicago suit, and points out that the letter mentions only Mr. Branand as the one who was enabled to negotiate the settlement of

the Chicago suit. Plaintiff asserts that there is no evidence that negotiations between the navigation company and the insurers were entered into prior to the date of the letter; that in all probability the negotiations were between Branand and the insurers, and that the statement of defendant that plaintiff, as president of the navigation company, no doubt, had been active in such negotiations and knew of the proposal of settlement, is not supported by the record.

It is clear that early in 1938 Leathem D. Smith retained counsel to represent him in a dispute with the defendants. The dispute largely concerned the rights of plaintiff arising out of contracts as to the vessel "Sinaloa," and also as to the sale of certain stock to Captain William Nicholson. There was no controversy as to the contract of August 7, 1936. That is the contract which provided for the $18,000 collateral loan. As a result of the negotiations to settle the controversies, the contract of August 12, 1938 was executed. The latter contract was between the Material Service Corporation, Henry Crown and Irving Crown, on the one hand, and Leathem D. Smith, in his individual capacity, on the other hand. We agree with the master that the defendants treated Smith as the owner of all the claims against them and the obligor of all moneys owing to them by Smith individually and by the companies with which Smith was associated. The parties agreed to make a complete settlement and to "wipe the slate clean." The $18,000 collateral note pledged the various gold notes therein mentioned and also pledged the earnings policy. At the time the collateral note was made all the parties knew that the motorship "Material Service" had been sunk, and that claims were being presented against the various insurers, including the underwriters of the earnings policy. The contract of August 7, 1936 obligated the navigation company to execute any instruments required for the purpose of perfecting the assignment of the policies

of earning insurance. It is a reasonable inference that the letter written the following day by the navigation company to the insurance brokers and the acknowledgment thereof by the insurance brokers was in furtherance of this provision of the contract. We are satisfied that the assignment so made was in effect an assignment of the policies. Osborn & Lange, Inc. had placed the policies and was acting for the insured and the insurers. At the time of the transactions, the parties looked upon the letter assigning the proceeds of the policies to defendant corporation as equivalent to the assignment of the policies. The defendant corporation did not at any time have the policies in its possession, nor did it have the letter which constituted the assignment. However, all of the parties recognized the rights of the corporation. It cannot be doubted that at all times from the execution of the note on August 7, 1936, until the time the note was canceled on August 12, 1938, the earnings policies were pledged to the defendant as collateral for the payment of the note. On that date the parties executed a written agreement for the purpose of settling the disputes that had arisen. The Crowns did not want to have any further dealings with plaintiff and so stated. Therefore, in the settlement they disposed of the controversy over which they had been negotiating, as well as all other matters, whether they were in controversy or not. In other words, the parties "wiped the slate clean." This contract was with plaintiff and the navigation company was not a party to it. While the $18,000 note was signed by the navigation company and Smith as an individual was not obligated thereon, nevertheless, the defendant corporation agreed to return to Smith all of his note obligations marked "satisfied," including the $18,000 note dated August 7, 1936. This settlement agreement, although specifying all of the collateral deposited with the note, failed to mention the earnings policy or any assignment thereof. If it had mentioned them as part of the col-

lateral, of course, there would be no law suit. On the day the contract was executed the defendant corporation stamped the note "paid" and delivered it to the plaintiff, together with the gold notes. We are satisfied that although Mr. Crown's letter of July 7, 1938 is important as indicating the concessions he was willing to make, it was not the sole basis of the agreement. To understand the basic agreement, it is necessary to go back into the transactions of the parties and the negotiations. It must be borne in mind that the settlement agreement was not signed until more than one month after Mr. Crown's letter of July 7, 1938. On August 3, 1938, the attorneys for the plaintiff sent a letter to Henry Crown and therein quoted to him a letter which they had received from Mr. Sanderson, personal attorney for plaintiff. The last proposal of the defendants to increase the amount to be put up for the payment of its debts to $22,500, was submitted to Mr. Sanderson by plaintiff. In the letter by Mr. Sanderson to the attorneys for plaintiff dated Sturgeon Bay, August 1, 1936, he recounted the matters which were to be included in the settlement. The third paragraph read:

"Mr. Smith's note held by the Material Service Corporation is to be cancelled and delivered to him; all of the collateral previously deposited by him as security for said note is to be delivered to him, and the collateral the Material Service Corporation holds as security for the Smith-Putnam Navigation Company note is to be returned to him." The contents of this letter were disclosed to Mr. Henry Crown. The latter acting for the defendants entered into the settlement agreement with the understanding that all of the collateral was to be returned with the $18,000 note. It cannot be doubted that the earnings policy and the assignment thereof stood as part of the collateral on the note. When the note was paid it was the duty of the defendant corporation to deliver the note and all the

collateral. It could not withhold part of the collateral. The only purpose of the collateral was to secure the payment of the note. It is manifest that when the note was paid the corporation no longer had any right to retain any part of the collateral, as there was then no debt to secure. The assignment of the proceeds of the insurance policies was for the purpose of securing the defendant corporation in the payment of the note. The defendant did not need to have the physical possession of the policies or of the assignment. All recognized that the purpose of the assignment was to secure the payment of the note. Should the action for the recovery of the policies be successful, the parties contemplated that the proceeds would be paid through Osborn & Lange, Inc. Had the navigation company defaulted in the payment of the note before anything was recovered, the defendant corporation could have sold the collateral, including the assignment of the proceeds on the earnings policy. However, if recovery were had on the policy before payment of the collateral note, the defendant corporation would have a right to hold the proceeds of such policies as security for the note if it was not then due, but in either contingency the right of the defendant corporation to the proceeds of the policies would be only as security for the note. We have studied with great interest the contention of the defendants that when they marked the $18,000 note "paid" and delivered the securities described in the contract of August 12, 1938 to the plaintiff, they elected to accept the assignment of part of the proceeds of the claim and the promise of Osborn & Lange, Inc. to recognize such assignment, as payment in full of said indebtedness. Defendants assert that the note having been so paid all obligations thereunder were at an end, but that the corporation continued to have its rights under the assignment. This contention is without merit. Clearly, the parties intended to satisfy the note and to return all the collateral, and there is no doubt

that the earnings insurance policy and the assignment thereof was part of the collateral. We agree with the findings of the master that the omission of a provision for the cancellation of the insurance assignment was due to a mutual mistake of fact by the parties. While it was proper to enter the decree to reform the instrument, we are of the opinion that the plaintiff would be entitled to judgment even though plaintiff had not asked that the agreement be reformed. When the defendant corporation received the money in settlement of the policies, it held such money for the use of the navigation company or the plaintiff. Equity regards that as done which should be done. The corporation should have released its assignment of the proceeds of the policy on August 12, 1938. On that date all of the collateral, including such assignment, should have been restored to the navigation company, or to Smith. To allow the defendant corporation to retain the proceeds of the policy would constitute an unjust enrichment. We are also of the opinion that the assignment by the navigation company to the plaintiff vests in him whatever interest the navigation company had in the proceeds of the insurance policy and in its claim against defendant corporation. Finally, defendants contend that the fixing of the master's fees at the sum of $620.75 was erroneous. The master filed with his report a certificate as to the services rendered by him and the amount of fees to which he claimed to be entitled. The statutory fees were stated to be $120.75, and he asked for $500 as his fees to be allowed by the court. Defendants do not object to the statutory fees, but assert that the chancellor erred in allowing the master any additional fees because of the lack of any evidence from which the court could determine such fees. Defendants cite the case of *Litwin v. Litwin,* 375 Ill. 90, 96, in support of their contention. Plaintiff concedes that the master should have shown the time he necessarily employed in each of the various duties re-

cited in his claim, but points out that defendants did not make any objection in the trial court and that at no time prior to the filing of their brief have they questioned the amount of the master's fees or the failure to itemize same in the manner pointed out by the Supreme Court. Defendants excuse their failure to object by saying that there was no occasion for them to file objections as to the amount of the fees, and that it was not necessary for them to take exceptions to the decree. If defendants wished to object to the fees claimed by the master, they could have objected before the chancellor and could have had the statement of their objections and the rulings thereon included in the record. As the defendants did not object in the trial court, they will not be permitted to raise the point here.

For the reasons stated, the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

KILEY, J., concurs.

MR. JUSTICE HEBEL concurs with the court's conclusion but not with all that is said in the opinion.